## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **JOSEPH MORRIS, individually and on behalf of** | : | |
| **All other similarly situated** | : | |
| | : | |
| **v.** | : | **C.A. 69-cv-4192-JJM** |
| | : | |
| **PATRICIA COYNE-FAGUE, in her capacity as the** | : | |
| **Director of the State of Rhode Island Department of** | : | |
| **Corrections, successor to ANTHONY TRAVISONO** | : | |

_____

### DEFENDANT'S MOTION TO TERMINATE MORRIS CONSENT DECREE

Now comes Defendant, Rhode Island Department of Corrections, and hereby moves, pursuant to 18 U.S.C. §3626, to terminate the Morris consent decree as and for the reasons proffered in the accompanying memorandum.

R.I. DEPARTMENT OF CORRECTIONS,
By its Attorney,

*/s/ Michael B. Grant*
_____
Michael B. Grant, Esquire (#3864)
R.I Department of Corrections
40 Howard Avenue
Cranston, Rhode Island 02920
TEL: (401) 462-0145
FAX: (401) 462-2583

### CERTIFICATION

I hereby certify that on 1/29/20 I filed the within document via the ECF filing system and that a copy is available for viewing and downloading.

*/S/ Michael B. Grant*
_____
Michael B. Grant #3864

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**JOSEPH MORRIS, individually and on behalf of** :
**All other similarly situated** :
:
    **v.** :   **C.A. 69-cv-4192-JJM**
:
**PATRICIA COYNE-FAGUE, in her capacity as the** :
**Director of the State of Rhode Island Department of** :
**Corrections, successor to ANTHONY TRAVISONO** :
_____

### DEFENDANT'S MEMORANDUM

Now comes Defendant, Rhode Island Department of Corrections ("RIDOC") and hereby moves, pursuant to 18 U.S.C. 3626, to terminate the Morris Rules consent decree based on the arguments proffered below.

## I.  HISTORICAL REVIEW OF THE MORRIS RULES

In October 1969, the instant class action lawsuit was filed on behalf of present and future inmates at the RIDOC.  As resolution of this matter, the parties entered into an interim decree (issued on March 10, 1970) that established new prison condition procedures at the ACI.  *Morris v. Travisono*, 310 F. Supp. 857 (D.R.I. 1970)

On April 20, 1972, Chief Judge Pettine issued the final decree. In relevant part, this final decree ordered:

> plaintiffs and members of their class are entitled to those minimum procedural safeguards with respect to classification and discipline as are set out in the classification and disciplinary rules of the 'Regulations Governing Disciplinary, Classification, and Mail Procedures for all Inmates at the Adult Correctional Institutions, State of Rhode Island,' part of the copy attached hereto which Defendants agree to promulgate pursuant to § 42-35-1, § 42-35-3(a) et seq. of the Rhode Island General Laws within ninety days from the date of this order and incorporate into a new inmate guide within a reasonable time thereafter.

In October 1972, the Morris Rules were promulgated pursuant to the Rhode Island Administrative Procedures Act ("APA").  *Id*.  One year after promulgation (in 1973), the RIDOC unilaterally suspended the Morris Rules following a serious security situation at the ACI resulting in two deaths, including a correctional officer.  *Id*.  When the Morris Rules were not reinstated following the conclusion of the emergency situation, the class action returned to the District Court. Chief Judge Pettine granted permanent injunctive relief and stressed that only "…unusual case[s], involving marked departure [from the 'Morris Rules'] which might give rise to a supportable claim of constitutional deprivation...' [citation omitted] shall have cognizance before this court." *Morris v. Travisono*, 373 F.Supp. 177, 184-85 (D.R.I. 1974) (*Morris II*).

In the absence of well-developed prison conditions jurisprudence in 1969, the consent decree entered in the *Morris* action was a needed and welcomed reaction that resulted from the conditions that existed *fifty (50) years* ago within the secured facilities of the Adult Correctional Institution.  The Morris Rules, for many years, served a legitimate interest in preserving the safety of inmates, staff and the community by providing minimal standards in the absence of developed law.  However, the Morris Rules are outdated.  Significant changes and clarifications in the law concerning prison conditions have provided needed guidance for prisons in the United States. The United States Supreme Court has more clearly refined the obligations of prisons and the rights of prisoners relative to classification, discipline and minimum conditions of confinement. Accordingly, the Morris Rules are no longer Constitutionally required to safeguard the rights of prisoners.

## II. STANDARD OF REVIEW

### THE PRISON LITIGATION REFORM ACT

This Motion to Terminate is governed by the Prison Litigation Reform Act of 1995,

codified as amended at 18 U.S.C. § 3626(b)(2) (the "PLRA"); the PLRA allows existing federal court orders concerning prison conditions to be subject to "the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. 18 U.S.C. § 3626.

In pertinent part, the PLRA states:

"(b)       Termination of relief.

(1)       Termination of prospective relief.

(A)  in any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener-

(i) 2 years after the date the court granted or approved of the prospective relief;

(ii)  1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or,

(iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act [entered April 26, 1996], 2 years after such date of enactment."

. . . . . . . . . . . . .

"(2)       Immediate termination of prospective relief.  In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

(3)       Limitation.  Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."

In 1970 the Morris Rules were established in *Morris v. Travisono* (U.S.D.C.R.I., Civ. A. No. 4192), and the PLRA was enacted in 1996.  In enacting the PLRA, Congress stated explicitly that the amendment shall apply to all prospective relief even if originally granted before the enactment of the Act.  *See* 18 U.S.C. §3626; *Laaman v. Warden, New Hampshire State Prison*, 238 F.3d 14, 17 n. 2 (1st Cir. 2001) (citing *Rouse*, 129 F.3d at 655). The PLRA broadly defines "prospective relief" to mean "all relief in any form that may be granted or approved by the court…including consent decrees." *Rouse*, 129 F.3d at 654 (citing 18 U.S.C. §3626(g)(7)(9)).  Consent decrees entered into before the enactment of the PLRA on April 26, 1996 are terminable "2 years after such date of enactment."  18 U.S.C. § 3626(b)(1)(A)(iii). Clearly RIDOC's instant motion to terminate pursuant to §3626 (b)(1) is timely.

As the First Circuit Court of Appeals explained "Congress passed the PLRA in an effort, in part, to oust the federal judiciary from day-to-day prison management". *Suffolk County Jail v. Rouse*, 129 F. 3d 649, 655 (1997) (quoting 141 Cong. Rec. 14,419 (1995) (statement of Sen. Abraham) ("[N]o longer will prison administration be turned over to Federal judges for the indefinite future for the slightest reason.")); 141 Cong. Rec. 14,418 (1995) (statement from Sen. Hatch) ("I believe that the courts have gone too far in micromanaging our Nation's prisons."); *Feliciano v. Rullan*, 378 F. 3d 42, 54 (1st Cir. 2004). The PLRA entitles RIDOC to immediate termination of any prospective relief, if such relief was granted without a finding by the Court that it is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right". *See* §3626 (b)(2).  "Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the

Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626 (b)(3). Accordingly, the main focus must be on whether the provisions the RIDOC seeks to terminate remain "necessary to correct a current and ongoing violation of the Federal right."

Under the PLRA, this motion will "operate as an automatic stay...beginning on the 30th day after" this motion is filed, unless the court produces written findings expressly stating the three required PLRA conditions are met. 18 U.S.C. §3626(e)(2). Further, the court "shall promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions." 18 U.S.C. §3626(e)(1). The court may postpone the automatic stay for up to sixty (60) days for "good cause, but the court may not postpone the automatic stay "because of general congestion of the court's calendar." 18 U.S.C. §3626(e)(3). The automatic stay remains effective until the court rules on the motion. *Miller v. French*, 530 U.S. 327, 331 (2000).

## III.   BURDEN TO DEMONSTARTE ONGOING FEDERAL VIOLATIONS.

The burden rests with the plaintiff to demonstrate that current and ongoing violations of federal rights continue to persist. *See Laaman*, 238 F.3d at 20; *Guajardo* 363 F.3d at 395-96 ("A plain reading of the PLRA, including its structure, imposes the burden on the prisoners."). The Fifth Circuit has concluded the PLRA standard is very different from motion for summary judgment standards. The PLRA standard requires courts to make written, outcome determinative findings based on the record whereas motions for summary judgment standards call for intermediate written findings on whether issues of fact compel further proceedings. *Guajardo*, 363 F.3d at 395-96.

## IV.   PROSPECTIVE RELIEF SHALL TERMINATE, UNDER THE PLRA, UNLESS THERE IS EVIDENCE OF ONGOING VIOLATIONS OF A FEDERAL RIGHT.

The federal rights of inmates incarcerated at the ACI are protected by RIDOC's present

policies and practices. The rights bestowed by the Morris Rules have been adopted and implemented in several departmental policies that will be identified and discussed below.

The Morris Rules, in part, established procedures for the classification and discipline of inmates at the RIDOC; in addition, the Morris Rules outlined privileges and restrictions for each classification, establish minimum conditions of confinement, and enumerate those inmate actions that constitute punishable conduct. *Cugini v. Ventutuolo*, 781 F. Supp. 107, 109 (D.R.I. 1992).

### A. INMATE DISCIPLINE.

The Morris Rules, in part, govern discipline procedures at RIDOC, which procedurally outlined the formal steps to be followed during the inmate disciplinary process, the punishable conduct and the related charges that could be levied against inmates. *See* Exhibit A, Morris Rules. The inmate facing discipline is provided with:

"1) Written charge by reporting officer or employee.

2) Investigation and review by superior officer.

3)Hearing before Discipline Board.

4) Administrative review.

5)Record."

*Id.* "DISCIPLINARY PROCEDURES, PROCEDURAL OUTLINE FOR DISCIPLINARY ACTION, FIVE MANADATORY STEPS".

Similarly, RIDOC's discipline policy establishes procedural guidelines for the operation of a code of inmate discipline that maintains order and furthers the rehabilitation of inmates. *See* Ex. B, Policy 11.01-7, I. The process that is provided to a Rhode Island inmate charged with discipline is as follows. Under RIDOC's disciplinary policy, the formal discipline process begins with a charging employee/officer submitting a disciplinary report to their superior officer as soon

as possible after the occurrence of the infraction. *Id.* at III.C.1.a. The superior officer reviews the report within 24 hours (excluding weekend and holiday). *Id.* at III.C.2.a. The Superior officer provides notice (excluding Class 4 infractions lowest in severity) where the inmate waives their rights under the policy) to the inmate orally and in writing (disciplinary report) not later than one day after the filing of the report and 24 hours prior to hearing. *Id. at* III.C.3.a. The written discipline report must show the inmate's name, identification #, work/housing assignments, time, date, place and details concerning the alleged violation as well as identity of charging employee. *Id.* at III.C.1.a.2. During the discipline hearing process an inmate is asked by a superior officer whether they would like a referral to an adult counselor to assist in preparing for the discipline hearing. *Id. at* 3.b. If the inmate makes such a request, an adult counselor is assigned and scheduled to be on duty at the time of the hearing. *Id.* at III.C.4.a. The adult counselor meets with the inmate prior to the hearing to assist with understanding the process, the charges pending and how to present a defense. *Id*. at III.C.4.b. The inmate has an opportunity during the hearing to present a reasonable amount of witness testimony subject to the discretion of the hearing officer. *Id.* III.C.5.e.(i)

Additionally, there is a process for appeal from an adverse finding following a discipline hearing, and an automatic review is made by the Warden for any discipline sanction in excess thirty days of restrictive housing. *Id*. at III.C.12.b and c. The hearing officer makes clear to the inmate that he/she may request an adult counselor or any other approved person for assistance to prepare any written request for review. *Id.* at III.12.b.3. and c.4. For imposed sanctions in excess of ninety days, the necessary information is forwarded to Assistant Director of Operations for an automatic review of the guilty finding. *Id*. at III.12.c.7. These safeguards clearly comport with the requirements of Due Process. However, as argued below, prevailing case law maintains that

inmates do not enjoy a liberty interest in the disciplinary process.

The Supreme Court of the United States has stated that "[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Sandin v. Conner*, 515 U.S. 472, 480 (1995). The Court specifically rejected the claim that an inmate has a right to remain in general population and stated that remaining in general population is not a liberty interest protected by Due Process based on its decision in *Meachum v. Fano*, 427 U.S. 215, (1976). In <u>*Meachum*</u>, the Supreme Court found that:

> Due Process Clause in and of itself does not protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated . . . ." *Id.* 427 U.S. 215, 225 (1976).

In *Sandin,* the Court went on to explain that the due process clause will not be implicated unless "while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.,* 515 U.S. at 484. This is because "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Goddard v. Oden*, 2015 U.S. Dist. LEXIS 39370, at *5 (D.R.I. Mar. 9, 2015) (*quoting Price v. Johnston*, 334 U.S. 266, 285 (1948)). This includes discipline by prison officials for misconduct which clearly "falls within the expected perimeters of the sentence imposed by a court of law." *Id.* Accordingly, "[o]nly changes in prison conditions resulting from discipline imposed without appropriate due process that constitute 'atypical' and 'significant' hardships sufficient to give rise to the loss of a liberty interest are *potentially actionable* under § 1983." *Id.* (emphasis

added).

This Honorable Court has stated that "[t]o implicate a liberty interest protected by the Due Process Clause, a plaintiff must allege a deprivation that is 'atypical and significant on the inmate in relation to the ordinary incidents of prison life.'" *Williams*, 2006 U.S. Dist. LEXIS 101809 at *7. In *Williams*, this Court found that sanctioning an inmate to twenty-one (21) days of punitive confinement "fail[s] to come within the reach of the 'atypical' and 'significant' benchmark which would implicate a liberty interest protected by the Fourteenth Amendment." *Id.* Likewise in *Goddard*, this Court has found that placement in disciplinary segregation for "an extra 30 days" does not implicate a liberty interest. *Goddard*, 2015 U.S. Dist. LEXIS 39370, at *6-7. Similarly, this Court has stated that placement in punitive segregation for one (1) year by itself is not sufficient to implicate a liberty interest. *Benbow v. Weeden*, 2013 U.S. Dist. LEXIS 109690, at *8 (D.R.I. July 10, 2013). This Court explained because the plaintiff failed to allege "plausible facts permitting the inference that his year of disciplinary segregation constituted the loss of a liberty interest under *Sandin*, the due process allegations based on disciplinary segregation should be dismissed for failure to state a claim." *Id.*

Accordingly, any inmate who has been charged with misconduct and facing discipline, at that charging and hearing stages, has no liberty interest to any certain or particular process. However, once sanctioned, if the resulting conditions are deemed atypical and significant on the inmate in relation to the ordinary incidents of prison life, a liberty interest is implicated. The Constitutional focus is on the resulting conditions following a guilty finding, not the disciplinary hearing process. Accordingly, the discipline provisions of the Morris Rules do not implicate any rights secured under the Constitution. We must therefore focus the inquiry on what minimal conditions are mandated by the Constitution during any term of segregation.

Additionally, as this Court has ruled, simply because an inmate is sanctioned to one (1) year in disciplinary confinement does not in and of itself implicate a liberty interest. *See Benbow*. Accordingly, the Morris Rules provision that limits a disciplinary sanction to thirty (30) days of disciplinary segregation for a single infraction does not have any basis or support under Federal law. *See* Exhibit A, III. Following the Supreme Court's decision in *Sandin*, Due Process is implicated only after a disciplinary hearing has resulted in the imposition of a term of disciplinary confinement. *Supra.,* 418 U.S. 539, 563-567 (1974).   It is at this juncture Due Process applies in determining whether the conditions of the restricted confinement are Constitutional.   If the conditions are deemed significant and atypical in relation to the ordinary incidents of prison life, a violation exists.   *Id*., *Supra., DuPonte at* 504, 509-10 (D.R.I. 2018).  Current precedent from the Federal Courts and from this Honorable Court clearly demonstrate the Morris Rules' scope far exceeds Constitutional mandate.   This Court has not made any findings, either in the various Morris Rules opinions themselves, or subsequently, that the relief therein is narrowly tailored, only extends to correct the violations of federal rights and is the least intrusive means to correct the violations.  18 U.S.C. §3626, (b)(2).  Accordingly, the Morris Rules should be terminated.

Finally, there is no basis in Federal law bestowing a right to a three (3) member disciplinary panel when an inmate is facing discipline*. See* Exhibit A, V.III.A.  The Constitution does not require a three-member disciplinary board and the Federal Courts have never required the same.  The Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539 (1974*),* detailed the process that is due to inmates facing discipline.  Minimum Due Process requires that an inmate receive advance notice of the charges, a written statement by the factfinders relative to the evidence relied upon and the reasons for the disciplinary action taken, a restricted right to call

witnesses and present documentary evidence when permitting this opportunity is not unduly

hazardous to institutional safety or correctional goals. *Id.* at 563-566.

### B. MINIMUM CONDITIONS DURING A TERM OF DISCIPLINARY CONFINEMENT

The Morris Rules, as concerning the allowable minimal conditions in disciplinary

confinement, provide:

A.     cell equipped with lighting sufficient to read by, toilet, sink, bed, blankets, and mattress.

B.     Suitable clothing.

C.     Personal hygiene supplies (including soap, toothbrush, toothpaste, powder, towel, and toilet paper).

D.     Writing materials, type and amount in discretion of superior officer on duty.

Prescription eyeglasses.

E.     Reasonable reading material, at least two books of inmate's choice and owned by the inmate.

F. Meals of the same type and quality as provided in the general population.

G. Showers at least twice a week.

H. Exercise outside cell not to commence until after five days unless otherwise ordered by institutional physician.

I. Right to send mail and receive letters.

J. Access to medical facilities.

See Exhibit A. .

The current policies of RIDOC secure all of these conditions. RIDOC policy 12.27

"Conditions of Confinement", requires that all disciplinary confinement inmates possess reading

materials (including books and newspapers), writing materials, religious items, cosmetics (hygiene

products), an assortment of clothing, bed linens, legal materials, playing cards, board games,

stamps, envelopes, and jewelry. *See* Exhibit C, attachment "Authorized items in Cells".

Additionally, inmates serving disciplinary confinement receive a minimum of (1) hour per day out of cell time, five (5) days per week. *Id.* at IV.B.3.c (1).  Inmates, at the discretion of the facility warden may participate in education and programming.  *Id*. at IV.B.3.c (3). Disciplinary confinement inmates have full access to health care, mental health care and dental services to the same extent as general population inmates, and in addition are allowed to keep medication on their person (in their housing cell).  *Id*. at IV.B.4. Moreover, nursing staff rotate through the disciplinary confinement areas daily.  *Id*. at IV.B.4.a.

Additionally, behavioral health services staff shall:

- meet with all disciplinary confinement inmates after they have completed 30 days in such confinement,  and will assess said inmates every 30 days thereafter.
- meet with disciplinary confinement inmates "who have acute or chronic mental illness, are currently receiving mental health treatment or have mental health histories as clinically appropriate";
- review the RIDOC's mental health and disciplinary databases to review the records of inmates placed in disciplinary confinement or restrictive housing.  *Id.* at IV.B.4.b.

Inmates placed in disciplinary confinement are afforded:

- a phone call to immediate family to inform them of their change in status.  *Id.* at IV.B.8c.(1).
- a 10 minute phone call to a family member if the inmate completes 30 days of disciplinary confinement without any further infractions; *Id.* at IV.B.8.c.(2).
- Inmates housed in disciplinary confinement are allowed direct "in-person" access to an inmate law clerk.  *Id.* at IV.B.9.a-b.

Additionally, all disciplinary confinement inmates who are sanctioned to more than 30 days of disciplinary confinement and who remain discipline free for forty-five (45) days are allowed to request for a suspension of their remaining time on said status. *Id.* at IV.B.10.c.(1). Mental health or medical staff may recommend to the warden a suspension of remaining disciplinary confinement time for medical or mental health reasons. *Id.* at IV.B.10.c.(4).(a).  Also, no disciplinary confinement inmate shall have their minimum privileges reduced except where it is determined that the inmate will destroy property or is a danger to himself or others. *Id.* at IV.C.

1.

All disciplinary confinement inmates are served the same meals as all other inmates housed in their facility.  *Id.*    Additionally, "under no circumstances is food used as a disciplinary measure."  *See* Exhibit. D., Menu Planning policy 16.05-3 II,D.2.

Behavioral health staff, on a daily basis, check the disciplinary records. If staff feel that an inmate's mental health status has contributed to the commission of an infraction, they will discuss the same with the Clinical Director/Psychologist and if appropriate will approach the facility warden to evaluate whether the "misconduct was as a result of symptoms of mental illness and/or to what extent the sanction interferes with an offender's treatment or recovery plan".  *See* Exhibit B, III. C.2.e.(1).  The warden may dismiss the charge or review the matter with behavioral health staff to determine the extent to which an inmate's mental health status influenced his/her behavior".  *Id* at III.C.2.e.(2).

Additionally, any inmate designated with a serious and persistent mental illness shall enter a Residential Treatment Unit (RTU).  This unit serves as an alternative to disciplinary confinement. *See* Exhibit E, RTU Manual P.3.  The mission of the RTU is to assist inmates to achieve their highest level of functioning by developing alternative coping skills that result in behavioral stability sufficient to return to general population.  *Id.*

Accordingly, to the extent the Morris Rules provide for Constitutionally secured minimal living conditions, present RIDOC policies and protocols meets those standards.   Accordingly, prospective relief under the Morris Rules is not required, as RIDOC's policies and practices are in compliance with Federal rights.

## C.  CONDITIONS OF CONFINEMENT-MINIMUM STANDARDS

The Morris Rules, in part, established the classification categories.  The Morris Rules also

established the minimum conditions an inmate may be subject to during their term of sentence regardless of status. The following categories were established:

-**Category "A":** comprised the general prison population, inmates within this category enjoyed all opportunities for work, education, rehabilitative and recreational programs based on availability.

-**Category "B":** subjected inmates to a temporary restrictive movement and closer observation than "A" population inmates.

-**Category "C":** inmates that displayed a chronic inability to adjust to the general population, or required maximum protection for themselves or others.

-**Category "D":** A category "C" inmate may have been classified to "D" category based on the course of conduct and required closer control than a "C" category inmate.  *See* Exhibit A at P.

The minimum standards set out by the Morris Rules for inmates classified to any of the above outlined categories are as follows:

I.      Except as otherwise provided, every inmate of the A.C.I. in categories A, B, C, and D or disciplinary statute, excluding punitive segregation, shall be entitled to at least the following:

   A. A cell equipped with lighting sufficient for an inmate to read by during hours prior to the time cell illumination is required to be extinguished for inmates in general population, toilet and sink, bed and mattress;
   B. Clothing to the extent required for use in the general population.
   C. Bedding, including blanket, sheets, pillows and pillowcases.
   D. Personal hygiene supplies (including soap, toothbrush, toothpaste, powder, towel and toilet paper.
   E. Minimum writing materials.
   F. Prescription eyeglasses.
   G. Any book, periodical, document, or other paper of his that he would be permitted to have in the general population, not to exceed five, except that such limitation shall not apply to lawbooks, legal periodicals or other legal materials.
   H. Meals of the same type and quality as provide in the general population;
   I. Showers at least twice a week;
   J. Exercise outside of the cell for at least one hour each day and where weather permits, such exercise shall be out-of-doors every other day.  (Holidays and weekends excluded.)
   K. Correspondence privileges available to all inmates.

      L.  Daily access to medical facilities.

      M.  Visiting subject to usual administrative control." *Id*. at P.

RIDOC's current policies secure these conditions. RIDOC policy 12.27 "Conditions of Confinement"-(see Exhibit C), provides a schedule for all authorized items to be maintained in a cell for each confinement status.  *See* Exhibit C, attachment entitled "Authorized Items in Cells". Inmates, regardless of confinement status, are allowed a pillow, linens, clothing, reading materials (newspapers & books), eyeglasses, playing cards, board games, stamps, envelopes, jewelry, writing materials, religious items, assorted hygiene items and cosmetics.  *Id.* Visits and phone calls are allowed on all statuses (disciplinary confinement does not allow visits except from clergy and legal).  Inmates are allowed a phone call just prior to being placed disciplinary confinement status and after 30 days). *Id*. at 4.B.8.c.(i). Recreation is afforded to all inmates on all statuses for at least 2 hours per day, excluding time out of cell for meals and showering, except inmates on disciplinary segregation who receive at least 1 hour per day, excluding meals and showering.  *Id.* at  4.B.3.

Additionally, "Inmates will be permitted uninterrupted correspondence and/or publications (e.g., letters, memos, greeting cards, books, magazines, etc.) as long as the correspondence/publications pose no threat to the safety and security of the facility, public officials, or the general public, do not hinder rehabilitation of an inmate, are not being used to further illegal activities and meet all other specifications contained within policy.  *See* Exhibit F, Policy 24.01.  "All inmate health, mental health and dental needs are managed the same as general population, including but not limited to, sick call, keep on person medication (KOP), and access to physicians/dentists. All medical emergencies are attended to immediately."  Exhibit C. IV (B) 4. "Nursing staff shall "trip" (walk through) the Restrictive Housing units/areas daily". *Id*. IV(B)4.(b).

Finally, all cells are properly illuminated during the day and for a portion of the evening.

During sleeping hours, cell lights are turned off and dimmer night lights are illuminated.  *See* Kettle affidavit.

Prison officials have a duty to "provide humane conditions of confinement;…ensure that inmates receive adequate food, clothing, shelter, and medical care, and… 'take reasonable measures to guarantee the safety of the inmates.'"  *Giroux v. Somerset County*, 178 F.3d 28, 31 (1st Cir. 1999); *see also Cortes-Quinones v. Jimenez-Nettleship, et al.*, 842 F.2d 556, 558 (1st Cir. 1988) ("When prison officials intentionally place prisoners in dangerous surroundings, when they intentionally ignore prisoners' serious medical needs, or when they are "deliberately indifferent" either to prisoners' health or safety, they violate the Constitution.").

A prisoner must establish two requirements to state a violation of the Eighth Amendment.  "First, the alleged deprivation of adequate conditions must be objectively serious, i.e., 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'"  *Id*. at 32 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "Second, the official involved must have had 'a sufficiently culpable state of mind described as deliberate indifference to inmate health of safety.'"  *Giroux v. Somerset County*, 178 F.3d at 32 (internal citations omitted).  Deliberate indifference means that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive of risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. at 837; *see also Cortes-Quinones v. Jimenez-Nettleship, et al.*, 842 F.2d at 558 ("the term 'knowledge of [a large]…risk can be inferred.'") (citations omitted).  In short, "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health…'" *Farmer v. Brennan*, 511 U.S. at 843.

Accordingly, to the extent that the Morris Rules implicate minimum standards (living conditions) guaranteed by the United States Constitution, RIDOC polices secure the very same standards.  Compliance with these minimal policy standards ensures against a serious risk to the health and welfare of inmates.   Accordingly, the standards set out in RIDOC's policies and practices provide the mandated Federal rights, and thus, termination of Morris is warranted. 18 U.S.C. §3626(a)(1)(B)(ii).

### D.  MORRIS RULES-EMERGENCY OR TEMPORARY PROVISIONS

The Morris Rules, in part, also provide certain provisions that may be exercised by prison administrators during emergencies.  The pertinent provisions state:

"When faced with an immediate threat to the security or safety of the Adult Correctional Institutions or any of its employees or inmates, officials of the institution may temporarily reassign inmates in accordance with the following regulations.

    I.    Reassignment by a correctional officer on approval of his immediate supervisor:
- A.  When a correctional officer or other employee witnesses an inmate commit a serious wrongdoing.
- B.  When an inmate presents reasonable eye witness information than an inmate committed a serious wrongdoing.
- C.  When an inmate seeks safety or protection from others.

    II.    By supervisory officials of rank of Lieutenant or above, pending investigation.
- A.When an inmate is suspected of serious wrongdoing, either committed or planned.
- B.  When an inmate is suspected of being a witness to overt acts which constitute a serious violation of institutional regulations or a violation of state law.
- E.  When requested by prosecuting attorney or superintendent of State Police.
  - a.  When inmate is suspected as perpetrator of a crime.
  - b.  When inmate is a material witness to a criminal act.

Requests under C will be honored upon oral request but shall not be observed beyond seventy-two (72) hours in absence of receipt by Assistant Director of a written confirmation by requesting authority.

        c.   All inmates assigned temporarily under the preceding provisions will, as soon as reasonably possible, be informed in writing of the reason for their assignment and will be afforded all other rights due them under institution disciplinary and classification procedures.

        d.   A written record of all temporary reassignments shall be forwarded to the Associate Director for his concurrence or nonconcurrence, and he shall forward the record to the Assistant Director or his designee for approval or disapproval.  The report showing review of each is to be placed in the inmate's permanent classification file.

        e.   All temporary assignments shall be reviewed at the next regular meeting of the Classification Board, which in any case will not exceed one week, and final action by the Board will be ordered without unnecessary delay."  *See* Exhibit A VI.-X.

Similarly, RIDOC policy 12.27 allows for an inmate to be classified and placed in Administrative Confinement when their pattern of conduct demonstrates a chronic inability to adjust to the general population, when maximum personal protection is required, when they pose a serious threat to themselves, to others, to the institutions or they pose a serious escape risk.  *See* Exhibit C, III.E.1. Pursuant to policy 15.01, ("Classification Process") a classification board hearing is conducted whenever necessitated by a major change in an inmate's behavior. *See* Ex. G. III.L. Inmates are notified in advance of their reclassification hearing date.  *Id*. at IV.B.10.d. Adult Counselors are responsible of reviewing the inmate's records and any additional necessary information for the reclassification process and present findings to classification board members. *Id.* at III.B.5.

In addition, sentenced inmates may be placed in Administrative Detention for investigative purposes, following which they shall be returned to their classification.  *Id*. at III.E.2.  The closer supervision provided by Administrative Detention is recommended by staff in writing "based on

the inmate's conduct, enemy issues, law enforcement requests and/or threats to the safety and security of the institution." *Id*. at IV.B.1.d.  The inmate will receive an administrative transfer notice within 24 hours of their removal from general population.  The notice includes information as to the inmate's right to object. *Id.* at IV.B.1.e.(1),(2).

Accordingly, departmental policies provide the same protections as the Morris Rules in the event an inmate is moved from general population due to their behavior or as a result of an investigation. Pursuant to departmental policy, inmates are notified in writing, provided a hearing, assistance by an adult counselor and an opportunity to object to the transfer.  To the extent that the emergency provisions of the Morris Rules provide Constitutional protections, the current polices of the department afford these same protections.

## F.  MAIL PROCEDURES

The Morris Rules, in part, also govern mail procedures for all inmates. These provisions state:

1.     All outgoing mail shall be transmitted unopened and uninspected.

2.     All incoming mail may be opened and inspected solely for the purpose of detecting contraband and said mail may not be read or delayed.

3.     Any incoming mail of any kind designated from courts, judges, or attorneys may be opened for inspection only in the presence of the inmate's addressee.

The RIDOC's policy, with respect to non-privileged incoming and outgoing mail, allows the same to be opened and inspected for contraband. *See* Exhibit H, Inmate mail policy, 1.4.3, A. 1-2.  In addition, the "Director or the Assistant Director of Institutions & Operations, may authorize the reading of incoming non-privileged mail when in his/her opinion such action is necessary to prevent entry of materials and/or information" that jeopardize the safety and security of the institutions.  *Id*. at B.1.  Further, "Incoming non-privileged mail is disapproved only to prevent

interference with facility goals of security, order, discipline, rehabilitation, if it might facilitate, encourage or instruct in criminal activity, or contribute to a hostile work environment.  Disapproval is not based upon an employee's personal views of the merit of such mail." *Id*. at B.3.a.

The Department's policy, with respect to privileged incoming and outgoing mail, allows staff to open and inspect for contraband such mail only in the presence of the receiving or sending inmate, and only if a reasonable belief exists that the security of the institution is at risk. *Id*. at 1.4.2, B.1-2, &1.4.2, C.1.  Departmental staff are prohibited from reading incoming or outgoing privileged mail. *Id*.  The Department considers privileged mail to include mail being sent to or from any State or Federal Court official, the U.S. President, Governor, member of Congress or State General Assembly, U.S. or State Attorney General, the Director or agent of the F.B.I., senior administrator of any State Police Department, RIDOC Director, Assistant Director or Grievance Coordinator of RIDOC, the R.I. Parole Board,  any public official or agency, The American Civil Liberties Union, Public Defender or an attorney. *Id.* at A. 2.

When the Department deems it necessary to remove any item from incoming mail, a written record is made of such action, a copy of the record and written notice is provided to the affected inmate as to the underlying reasons for the refusal.  *Id*. at 1.4.1. B. 9. a.  The inmate is also notified of the appeal process to be taken. *Id* at B. 10. a.  Finally, in the event any outgoing mail is not permitted to be mailed, based on policy, the inmate is notified in writing as to the reason of the refusal and the process which he/she may rely on to appeal the decision.  *Id*. at 12. a.

The Departmental policy governing mail is consistent with the existing Federal law. Inspection of an inmate's mail may implicate First Amendment rights. *Felton v. Lincoln*, 429 F.Supp.2d 226, 242-43 (D. Mass. 2006)(citing *Stow v. Grimaldi*, 993 F.2d 1002, 1003-04 (1st Cir. 1993)).  However, prison administrators may rightfully impose restrictions on incoming mail if

the restriction is reasonably related to a legitimate penological interest. *Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S. Ct. 1874 (1989). The imposition of restrictions on outgoing mail is authorized if the restriction is in furtherance of a substantial governmental interest unrelated to the suppression of expression and no greater than necessary to achieve such goal. *Procunier v. Martinez*, 416 U.S. 396, 413, 109 S.Ct. 1874 (1974). The Supreme Court has recognized "security, order, and the rehabilitation of inmates" as substantial government interests. *Id*. at 396; see also *Stow*, 993 F.2d at 1004. With regard to privileged mail, the Supreme Court allows prison administrators to open and inspect such mail when in the presence of the inmate. *Wolff*, 418 U.S. at 577.

## F.  PROSPECTIVE RELIEF MUST BE TERMINATED UNLESS THE DISTRICT COURT MAKES THE REQUIRED FINDINGS THAT THE RELIEF IS NARROWLY DRAWN, EXTENDS NO FURTHER THAN NECESSARY AND IS LEAST INTRUSIVE, AND ALSO FINDS ONGOING, SYSTEM-WIDE CONSTITUTIONAL VIOLATIONS.

The PLRA expressly restricts a court's power to continue "certain forward looking" relief in civil actions challenging conditions in prisons or pretrial detention facilities." *Benjamin v. Jacobson*, 172 F.3d 144, 154-55 (2d Cir. N.Y. 1999) (en banc). The PLRA prohibits a court order approving any prospective relief unless the court first finds that such relief is: (1) narrowly drawn, (2) extends no further than necessary to correct the violation of the involved federal right, and (3) is the least intrusive means necessary to correct the violation of that federal right. *See* 18 U.S.C. §3626(a)(1)(A), *Rouse* at 654, *Feliciano at* 54. If a court order granting prospective relief does not expressly state that the required three conditions are satisfied, the PLRA mandates that prospective relief shall terminate in the following manner:

> "In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the

Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 USCS § 3626(b)(2).

The PLRA also limits the court's termination power in the following manner:

"Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 USCS § 3626(b)(3).

Where, as here, the consent decree was entered before the enactment of the PRLA, without the now required findings, "the prospective relief terminates unless the district court makes these findings *and* ... also finds ongoing, system-wide violations." *Guajardo,* 363 F.3d at 395.

This Honorable Court, for decades, has routinely entertained Constitutional claims from the individual Plaintiff class members alleging deprivations due to the Defendant's disciplinary and classification procedures and policies.  This Court is quite familiar with the conditions of confinement as they exist in the disciplinary confinement areas of the various facilities that comprise the R.I. Department of Corrections as well as those conditions maintained in the various classification statuses.  Inmates are provided with clothing, adequate meals and health care, religious services, recreation, out of cell time, access to family and friends through visits and by telephone, library resources and to attorneys.  This Court has routinely found RIDOC in compliance with Federal law.

**CONCLUSION**

Accordingly, in light of the above arguments in support of the position that the relief provided by the Morris Rules are not narrowly drawn to protect and no longer needed or necessary to correct current and ongoing Federal rights violations, the Department urges that this Honorable Court terminate the Morris Rules and all prospective relief provided therefrom.

23

R.I. DEPARTMENT OF CORRECTIONS,
By its Attorney,

/s/ Michael B. Grant

_____
Michael B. Grant, Esquire (#3864)
R.I Department of Corrections
40 Howard Avenue
Cranston, Rhode Island 02920
TEL: (401) 462-0145
FAX: (401) 462-2583